## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HAROLD LITWIN, On Behalf of Himself and All Others Similarly Situated and Derivatively on behalf of Defendant CHECKPOINT SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM SMOOT ANTLE III, GEORGE BABICH, JR., STEPHEN N. DAVID, HARALD EINSMANN, JULIE S. ENGLAND, MARC T. GILES, DANIEL R. MAURER, JACK W. PARTRIDGE, CCL INDUSTRIES, INC., and CCL INDUSTRIES USA CORP., <br><br> Defendants, <br><br> -and- <br><br> CHECKPOINT SYSTEMS, INC., a Pennsylvania corporation, <br><br> Nominal Defendant. | Case No. <br><br> **CLASS ACTION AND DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Harold Litwin ("Plaintiff"), by his undersigned counsel, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

### NATURE OF THE ACTION

1.      This is a shareholder class and derivative action brought by Plaintiff on behalf of himself and all other public shareholders of Checkpoint Systems, Inc. ("Checkpoint" or the "Company") and the Company itself, against the members of the Company's Board of Directors (the "Board" or the "Individual Defendants"), CCL Industries, Inc. ("CCL") and CCL's wholly

owned indirect subsidiary CCL Industries USA Corp. ("Merger Sub").  This action arises out of defendants' breaches of their fiduciary duties in connection with the proposed acquisition of the Company by CCL (the "Proposed Transaction") following an unfair process, in exchange for inadequate consideration, and without disclosing all material information concerning the Proposed Transaction to Company shareholders.

2.      On March 2, 2016, Checkpoint issued a press release announcing its entry into an Agreement and Plan of Merger with CCL (the "Merger Agreement"), pursuant to which CCL will acquire Checkpoint in a transaction valued at approximately $443 million.  Under the terms of the Merger Agreement, Checkpoint shareholders will receive $10.15 per share in cash for each share of Checkpoint common stock they own (the "Merger Consideration").  Merger Sub will merge with and into Checkpoint with the Company surviving the merger as a wholly owned subsidiary of CCL.  The Proposed Transaction is expected to close in mid-2016.

3.      Defendants have exacerbated their breaches of fiduciary duty by attempting to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision allowing CCL access to any rival bidder's information and four (4) business days to match any competing bid for the Company, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer; and (iii) the imposition of a termination fee of $13 million on the Company payable to CCL in certain circumstances, including if the Company terminates the Merger Agreement or the Board changes its recommendation to shareholders in order to pursue an alternative superior proposal.  These

provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.

4.      In addition, the Proposed Transaction is rife with conflicts.  For example, by agreeing to sell the Company for the inadequate Merger Consideration, the Board members (and Company management) will receive an immediate payday as a result of the accelerated vesting of any unvested Company stock options and unvested restricted stock.  Further, Checkpoint President and Chief Executive Officer ("CEO") defendant George Babich, Jr. ("Babich") and other named executive officers stand to receive significant change-in-control payments in connection with the Proposed Transaction.  Defendant Babich alone has guaranteed himself over $4.1 million in golden parachute compensation.

5.      Finally, in an attempt to secure shareholder support for the inadequate Proposed Transaction, on March 17, 2016, the Company filed a Schedule 14A Preliminary Proxy Statement (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC") and disseminated it to Checkpoint shareholders.  The Proxy, which recommends that Checkpoint shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the valuation analyses prepared by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in connection with the rendering of its fairness opinion; (ii) Checkpoint management's projections, utilized by Morgan Stanley in its financial analyses; and (iii) material information concerning the sale process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of sections 14(a) and 20(a) of the U.S. Securities and Exchange Act of 1934 (the "Exchange Act") as shareholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

6.    In short, the Proposed Transaction is designed to unlawfully divest Checkpoint's public shareholders of the Company's valuable assets without fully disclosing all material information concerning the transaction to Company shareholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the shareholder vote the Proposed Transaction unless and until such problems are remedied.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to section 27 of the Exchange Act.   The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

8.    This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Checkpoint is incorporated in Pennsylvania and its registered agent is located in this District.   Moreover, each of the Individual Defendants, as Company officers or directors, either reside in this District or have extensive contacts within this District.

## PARTIES

10.    Plaintiff is, and at all times relevant hereto has been, a Checkpoint shareholder.

11.    Nominal defendant Checkpoint is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.   Checkpoint maintains its principal executive offices at 101 Wolf Drive, Thorofare, NJ 08086.   Founded in 1969, Checkpoint is a provider of

merchandise availability solutions for the retail industry, encompassing loss prevention and merchandise visibility. Checkpoint operates across America, Europe and Asia Pacific and employs more than 4,700 people worldwide. Checkpoint's common stock is traded on the New York Stock Exchange under the ticker symbol "CKP."

12.      Defendant William Smoot Antle, III ("Antle") has been a director of the Company since 2003. Defendant Antle previously served as Chairman of the Board from May 2012 to June 2015. Defendant Antle is a member of the Audit Committee and the Governance and Nominating Committee.

13.      Defendant Babich has been President and CEO of the Company since February 2013 and a director of the Company since 2006. Defendant Babich previously served as Checkpoint's Interim President and CEO from May 2012 to February 2013.

14.      Defendant Stephen N. David ("David") has been a director of the Company since 2012 and Chairman of the Board since June 2015. Defendant David is a member of the Audit Committee.

15.      Defendant Harald Einsmann ("Einsmann") has been a director of the Company since 2005. Defendant Einsmann is a member of the Compensation Committee and the Governance and Nominating Committee.

16.      Defendant Julie S. England ("England") has been a director of the Company since 2010. Defendant England is Chair of the Governance and Nominating Committee.

17.      Defendant Marc T. Giles ("Giles") has been a director of the Company since 2013. Defendant Giles is Chair of the Audit Committee, and is a member of the Compensation Committee and the Governance and Nominating Committee.

18.     Defendant Daniel R. Maurer ("Maurer") has been a director of the Company since 2016.  Defendant Maurer is a member of the Compensation Committee and the Governance and Nominating Committee.

19.     Defendant Jack W. Partridge ("Partridge") has been a director of the Company since 2002.  Defendant Partridge is Chair of the Compensation Committee, and is a member of the Governance and Nominating Committee.

20.     Defendants Antle, Babich, David, Einsmann, England, Giles, Maurer and Partridge are collectively referred to herein as the "Board" or the "Individual Defendants."

21.     Defendant CCL is a corporation organized under the laws of Canada.  CCL's headquarters are located at 105 Gordon Baker Road, Suite 500, Toronto, Ontario M2H 3P8.  According to the Merger Agreement, CCL's mailing address for service is 161 Worcester Road, Suite 603, Framingham, Massachusetts 01701.  CCL is a world leader in specialty label and packaging solutions for global corporations, small businesses and consumers.  CCL's stock trades on the Toronto Stock Exchange under the ticker symbols "CCL.A" and "CCL.B."

22.     Defendant Merger Sub is a Pennsylvania corporation and a wholly owned indirect subsidiary of CCL.

**INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

23.     In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive and disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)    discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d)    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

24.    In accordance with their duties of loyalty and good faith, Individual Defendants, as directors or officers of Checkpoint, are obligated to refrain from:

(a)    Participating in any transaction where the directors' or officers' loyalties are divided;

(b)    Participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation;

(c)    Unjustly enriching themselves at the expense or to the detriment of the public shareholders; or

(d)    Unjustly entrenching themselves as managers and/or officers of the Company by failing to give adequate consideration to legitimate bids for the Company.

25.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, candor and independence owed to the Company.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Checkpoint common stock (the "Class"). Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of March 11, 2016, there were 41,623,595 shares of Company common stock issued and outstanding. All members of the Class may be identified from records maintained by Checkpoint or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

29.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(a)     whether the Individual Defendants breached their fiduciary duties of loyalty, good faith, due care or candor with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     whether the process implemented and set forth by the defendants for the Proposed Transaction, including but not limited to, the Merger Agreement, the Proposed Transaction, and

the negotiations concerning the Merger Agreement and the Proposed Transaction is entirely fair to the members of the Class;

(c)     whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company and its assets;

(d)     whether defendants have violated section14(a) or 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by issuing the materially false and misleading Proxy to Checkpoint shareholders;

(e)     whether Plaintiff and the other members of the Class would be irreparably harmed if defendants are not enjoined from effectuating the Proposed Transaction as a result of the wrongful conduct described herein; and

(f)     whether Plaintiff and the Class are entitled to injunctive relief, damages or other relief.

30.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of defendants' wrongful conduct as alleged.

31.     Plaintiff will fairly and adequately protect the interests of the Class, and have no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

33.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE AND DEMAND ALLEGATIONS

34.     Plaintiff also brings this action derivatively in the right of Checkpoint, pursuant to Pennsylvania law, to redress injuries suffered, and to be suffered, by Checkpoint as a direct result of the Individual Defendants' breaches of fiduciary duty.  Checkpoint is named as a nominal defendant in a derivative capacity.

35.     Plaintiff will adequately and fairly represent the interests of Checkpoint in enforcing and prosecuting its rights.

36.     Plaintiff was a shareholder at the time of the wrongdoing of which Plaintiff complains and has been a shareholder continuously since that time.

37.     The Board of Checkpoint at the time the Proposed Transaction was announced consisted of the following eight individuals: defendants Antle, Babich, David, Einsmann, England, Giles, Maurer and Partridge.

38.     Plaintiff made a written demand on the Board on March 9, 2016, as required by Rule 1506, in which Plaintiff informed the Board of alleged wrongdoings and asked the Board to investigate the breaches of fiduciary duty complained of herein and refrain from consummating the Proposed Transaction.  A copy of the demand and the Board's response thereto are collectively attached as Exhibit 1.

39.     Despite Plaintiff's demand, the Board has continued to pursue the Proposed Transaction prior to completing an investigation of the alleged wrongdoing.  Due to the speed with which the defendants seek to close the Proposed Transaction, Plaintiff is forced to file this action to challenge the defendants' wrongdoing.  Accordingly, demand is constructively excused, as the

Proposed Transaction may be effectuated, thereby causing the Company irreparable harm, before

a final response to Plaintiff's demand is provided.

## SUBSTANTIVE ALLEGATIONS

### The Proposed Transaction

40.     On March 2, 2016, Checkpoint issued a press release announcing the Proposed

Transaction.  The press release stated, in pertinent part:

> THOROFARE, N.J.--Mar. 2, 2016-- Checkpoint Systems, Inc. (NYSE:CKP), a leading global supplier of merchandise availability solutions for the retail industry, today announced that it has entered into a definitive agreement to be acquired by an affiliate of CCL Industries Inc., a world leader in specialty label and packaging solutions for global corporations, small business and consumers, for $10.15 per share in cash, for a total transaction value of approximately $443 million. The purchase price represents a premium of 29% over Checkpoint's closing share price on March 1, 2016, and a 50% premium over the 30-day volume-weighted average price. The transaction is subject to specified closing conditions, including approval by a majority of Checkpoint's shareholders.

> Checkpoint's board of directors has unanimously approved the merger agreement and recommends that its shareholders vote to approve the merger agreement. Checkpoint expects to hold a special meeting of its shareholders to consider and act upon the proposed merger as promptly as practicable. Details regarding the record date for, and the date, time and place of, the special meeting will be announced when finalized.

### Company Background and Its Excellent Prospects for Growth

41.     Checkpoint is a leading global manufacturer and provider of technology-driven loss

prevention, inventory management and labeling solutions to the retail and apparel industries.  In

1969, Checkpoint was formed as a wholly owned subsidiary of Logistics Industries Corporation

("Logistics").  Eight years later, on June 30, 1977, Checkpoint was spun off from Logistics.  In the

following years, Checkpoint implemented radio frequency ("RF") electronic article surveillance

across retail stores and in the mid-1990s, after purchasing two European systems manufacturers,

Checkpoint established direct access to the European market.  Today, the Company provides end-

to-end solutions enabling retailers to achieve accurate real-time inventory, accelerate the replenishment cycle, prevent out-of-stocks and reduce theft.

42.     The Company is comprised of three business segments: Merchandise Availability Solutions ("MAS"), Apparel Label Solutions ("ALS"), and Retail Merchandising Solutions ("RMS").   The MAS segment includes electronic article surveillance products and solutions utilizing RF identification ("RFID") technologies.  The ALS segment includes printing solutions of various labels and tags, including RFID tags.  The RMS segment includes handheld labeling systems and supermarket retail displays.

43.     Checkpoint serves 58% of the top 250 global retailers identified by Deloitte LLP, with the Company providing products and solutions to five of the top ten U.S. retailers. Checkpoint's business is geographically diversified, with non-U.S. markets accounting for 71% of the Company's total net revenue in 2015.

44.     The Company's future business prospects are strong.  Retail loss prevention is a significant market with a steady growth rate of approximately 3% to 4% per year.  According to analysts, retail loss prevention spending is highly recurring due to retailer's financial motivation to limit loss from shoplifting.  Notably, Checkpoint overtook Tyco Retail Solutions as the leader in this market in 2014, partially due to being engaged by Family Dollar Stores and TESCO to provide retail loss prevention solutions.

45.     Checkpoint's products are well known in the industry for their high quality and long useful lives, and remain attractive to their clients despite the entry of new competitors in the market.  A survey conducted in 2013 found that Checkpoint tags have almost a 0% false alarm rate (compared to 23% for its peers), the best detection rate (95% of the time) and better ease of use. The Company has focused on increased adoption of RFID technology, which provides substantial

long-term growth potential.  Recent technology innovations have reduced both the size and unit cost of RFID tags by over 90%, and industry analysts expect widespread adoption of this technology.  Combined with a recovering economy and an expected boost in U.S. retail traffic in the years to come, Checkpoint will benefit from increased demand for its products.

46.     Since 2011, the Company has undertaken cost-cutting and process improvement initiatives to decrease certain expenses and improve operating margins.  The results of these initiatives have been promising.  Since the first quarter of 2012, Checkpoint has improved both gross and EBITDA margin.  In September 2014, the Company announced an additional profit enhancement plan that included headcount reduction and streamlining manufacturing—leading to an annual benefit of $15 to $20 million.  According to the Company's Form 10-K filed with the SEC on March 3, 2016, the first phase of the profit enhancement plan was implemented in the third quarter of 2014 and was expanded in the fourth quarter of 2015.  The remaining phases of the plan, including headcount reductions, are expected to be substantially completed by the fourth quarter of 2016.

47.     Checkpoint has struggled recently with enormous year-over-year foreign currency headwinds and challenging market dynamics.  Despite this, Checkpoint has strong long-term growth prospects, including the broader adaptation of its radio frequency identification technology by retail customers.  On August 3, 2015, the Company reported its financial results for the second quarter of 2015, including net revenues of $147.6 million as compared to net revenues of $170.9 million year over year, due in part to foreign currency effects of 8.5%.  Gross profit margin was 41.7%, and cash provided by operating activities was $0.1 million—including the effect of a $9 million one-time litigation settlement payment.  Commenting on the financial results, Checkpoint President and CEO defendant Babich stated:

I am pleased to report second quarter performance in-line with management's expectations. While we continue to face a number of challenges in our business, including enormous year-over-year foreign currency headwinds, the sunset of our significant 2014 EAS hardware rollouts and challenging market dynamics in ALS, we are executing on our operational and strategic plans and our 2015 investments in topline growth initiatives are beginning to gain traction.

\* \* \*

Finally, later in 2015 and into 2016, we expect one of our largest European customers will begin to deploy our Merchandise Visibility solutions in approximately 150 stores and distribution centers in France. This represents the next step forward with this retailer who we expect to deploy our end-to-end Merchandise Visibility solutions worldwide, beginning in the DC, then into the back-of-store, then in-store.

\* \* \*

While we continue to face a number of challenges in our businesses, we also continue to gain share in EAS as we transition and transform our legacy businesses by expanding our RFID capabilities and gaining share in the fast-growing market.

48.     Then on November 3, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015.  Checkpoint reported net revenues of $145.9 million as compared to net revenues of $160.6 million year over year, due in part to foreign currency effects of 8.4%.  Gross profit margin was 40.2%, and cash provided by operating activities was $8.1 million.  Commenting on the financial results, defendant Babich remarked:

Third quarter results were squarely in line with our expectations and slightly ahead of our plan for the first nine months of the year, on a constant currency basis. Since our last quarterly report, we have successfully deployed our new E10 2.0 dual RF/RFID-enabled antennas in more than 700 stores for a customer in North America and are currently executing our previously-announced EAS swap-out project in Asia. However, a number of risks and uncertainties have emerged over the past few weeks that we expect to have a material impact on our fourth quarter results.

\* \* \*

Despite these near-term setbacks, we continue to believe in the future of Checkpoint and believe that our stock is undervalued. To that end, during the third quarter we repurchased approximately 439,000 shares, returning an additional $3.4 million in

14

capital to our shareholders, and we expect to continue opportunistic repurchases of our shares in the public market.

49.     On March 3, 2016, Checkpoint issued a press release announcing its financial results for the fourth quarter ("4Q") and full year 2015.  For 4Q 2015, the Company reported net revenues of $165.1 million as compared to net revenues of $183.1 million year over year, due in part to foreign currency effects.  Gross profit margin was 41%, and cash provided by operating activities was $29.8 million compared to $23.6 million year over year.  During 4Q 2015, Checkpoint repurchased 450,000 shares, returning $3.2 million of capital to shareholders.  Net revenues for full year 2015 were $587.1 million, as compared to net revenues of $662 million year over year.  Gross profit was $244.4 million, as compared to $285 million year over year.

50.     Unfortunately for the Company's public shareholders, the Board agreed to cash Checkpoint shareholders out for the inadequate Merger Consideration.

**The Inadequate Sale Process**

51.     The Board performed a fundamentally flawed process to sell the Company.  As a result of strategic initiatives, Checkpoint was poised for a turnaround and was well on its way toward achieving sustained, long-term standalone success.  However, Checkpoint's conflicted leadership decided to plot a different course for the Company – one involving a sale process steered entirely in favor or CCL.  After running a deficient and abbreviated sale process, the Board agreed to the inadequate Proposed Transaction with CCL, which provides the Board members and Checkpoint executives with a substantial payday through the immediate and full vesting of all outstanding stock options, restricted stock units and performance-based awards, whether or not vested, as well as an opportunity to liquidate their large and previously illiquid holdings.

52.     In late 2014, the Board directed management to approach several competitors and strategic partners to assess potential partnerships.  Although the outreach led to various discussions

with an undisclosed number of parties and initial negotiations with one party regarding a business combination, none of the parties proceeded with an arrangement involving Checkpoint. The Proxy fails to disclose whether the negotiations include price discussions and the details thereof.

53. During the same time, Checkpoint launched a series of internal strategic initiatives targeted at improving the Company's long-term financial performance.

54. In March 2015, the Board considered conducting a targeted outreach to potential buyers but instead decided to continue focusing on the internal strategic initiatives of the Company.

55. At a June 2, 2015 Board meeting, the Board authorized Morgan Stanley to contacted a discreet outreach to a select group of financial sponsors. It is unclear whether these financial sponsors included the parties that engaged in discussions and negotiations of a potential business combination with Checkpoint in 2014. Following Morgan Stanley's outreach in June and July, four of the financial sponsors contacted signed nondisclosure agreements. The parties declined to pursue a strategic transaction with the Company at that time. It is unclear if these four parties (and any other parties who executed nondisclosure agreements with Checkpoint) are precluded from making a topping bid for the Company by the terms of their nondisclosure agreements.

56. On August 20, 2015, a financial sponsor that had previously contacted Checkpoint in the fall of 2014, referred to in the Proxy as Bidder A, executed a nondisclosure agreement with Checkpoint, and Morgan Stanley initiated discussions with Bidder A concerning a potential acquisition of Checkpoint.

57. In the early fall of 2015, CCL contacted Morgan Stanley seeking an introduction and to initiate discussions exploring a potential acquisition of Checkpoint.

58.     On October 25, 2015, Bidder A expressed verbal interest in acquiring Checkpoint at a price between $8.50 and $9.25 per share in cash.

59.     At the Board's October 27, 2015 meeting, the Board directed Morgan Stanley to continue discussions with CCL and seek a firm price from Bidder A.  On October 30, 2015, CCL executed a nondisclosure agreement and Checkpoint began sharing nonpublic information with CCL.

60.     On November 3, 2015, the Company announced it was restating its first and second quarter financial results due to the effect of financial statement errors attributable to an error in the accounting for the quarterly income tax provision and revised its 2015 fiscal guidance.

61.     On November 16, 2015, Checkpoint formally engaged Morgan Stanley to serve as its financial advisor.

62.     On December 1, 2015, CCL submitted an offer to acquire Checkpoint for $10.00 per share in cash.  Six days later, Bidder A submitted an offer to acquire the Company for between $7.50 and $8.00 in cash per Checkpoint share.

63.     At a December 9, 2015 Board meeting, the Board authorized continued discussions with CCL but decided not to continue discussions with Bidder A without requesting that Bidder A raise its offer.  The Board directed Morgan Stanley to reach out to a limited list of five strategic parties, none of which expressed interest in acquiring Checkpoint.

64.     From December 2015 through February 2016, CCL conducted due diligence and talks between Checkpoint and CCL continued.  On February 18, 2016, CCL President and CEO Geoffrey T. Martin ("Martin") reaffirmed CCL's offer price of $10.00 per share.

65.     At a February 24, 2016 Board meeting, the Board discussed the potential transaction with CCL.  Following discussion of the risks and potential benefits of seeking a higher

price, the Board authorized defendant Babich to seek a higher price from CCL. That evening, defendant Babich called Martin and requested an increased offer price, indicating he believed the Board would support a price of **$10.30** per share because it coincided with the higher end of certain valuation metrics in the analysis Morgan Stanley presented to the Board.

66.     CCL agreed to raise its offer by an insignificant amount, initially to $10.10 and finally to $10.15 on February 28, 2016. Rather than remaining a standalone company and continuing to allowing Checkpoint shareholders to reap the benefits of the Company's strategic initiatives or electing to conduct a full value-maximizing market check, the Board finalized the merger with CCL.

67.     On March 1, 2016, the Board unanimously approved the Merger Agreement and recommended that shareholders approve the Proposed Transaction. That evening, the Merger Agreement was executed and each party issued a press release announcing the Proposed Transaction.

**The Proposed Transaction is Inadequate**

68.     Given the Company's positioning for long-term growth, the Proposed Transaction fails to adequately compensate Checkpoint's shareholders for the intrinsic value of the Company, as well as the significant benefits that CCL will receive from the Proposed Transaction.

69.     CCL is seeking to acquire the Company at a time when the long-term prospects of Checkpoint are increasing, and while its stock price is undervalued. Notably, the Merger Consideration falls below the Company's value from 2013 until the first half of 2015.

70.     The Company's stock currently trades at a heavy discount as compared to its peers, in part because it is only covered by four analysts—none of whom are affiliated with a major brokerage firm. Recent accounting errors have also contributed to the discount in stock price.

71.     In an article published by *Security Systems News*, Imperial Capital, LLC ("Imperial Capital") Director Jeff Kessler ("Kessler") noted that the Proposed Transaction will make CCL "a better competitor to Tyco, [which has a one-stop-shop retail solution]." Kessler added that the Proposed Transaction "adds more arrows to [CCL's] quiver, and they bought it at a really good price." In detailing the benefits CCL expects to realize from the Proposed Transaction, Kessler explained: "This acquisition should allow CCL to expand its international operating platform and realize immediate earnings accretion."

72.     Shortly after the Proposed Transaction was announced, Imperial Capital issued a note concerning the deal:

> ***We believe that the stated valuation of US$443mn is disappointing,*** relative to the company's prospects several years ago, the reportedly 'large pipeline discussion' Checkpoint has been having with key retailers, and the 6.9x FY15E EV/EBITDA valuation which the company is being valued at by CCL (which is below average for our select group of applied security technology vendors.

Emphasis added.

73.     In a March 2, 2016 press release, CCL touted the significant benefits it expects to receive from the Proposed Transaction, including up to $40 million in highly realizable synergies. The press release highlighted the "compelling and unique opportunity for CCL," stating:

> The transaction represents a compelling and unique opportunity for CCL to enhance breadth and scale, while creating an opportunity to realize meaningful synergies, and earnings accretion as follows:
>
> • Leading technology-driven label solutions provider to the retail and apparel sector
>
> • Long-standing, blue-chip customer base of top global retailers and apparel brands
>
> • Attractive 'smart label' product portfolio including radio-frequency identification ("RFID") solutions
>
> • Global sales footprint spanning 29 countries serving all major retail markets

- Expands CCL's international operating platform, especially in Asia

- Identified annual synergies of up to $40 million

- Asset-light business model and improved working capital efficiency could accumulate significant free cash flow to drive rapid de-leveraging

- Meaningful and immediate earnings accretion

74.     In the press release, CCL's President and CEO Martin stated:

We have admired Checkpoint for many years as they built a unique, leading global position providing technology-driven label solutions to the retail & apparel industry.  We are very pleased to welcome their deeply experienced people to CCL where they will continue to focus on this important industry for emerging 'smart label' technologies.

75.     Reaction to the deal has been negative.  On March 3, 2016, North Star Partners, LLC ("North Star"), one of Checkpoint's largest shareholders owning 3.9% of the Company's outstanding shares, delivered a letter to Checkpoint Chairman of the Board defendant David, announcing North Star's opposition to the Proposed Transaction.  In the letter, North Star Managing Partner Andy Jones stated, in pertinent part:

*The undervaluation of Checkpoint, compared to its intrinsic value, is now more acute than ever.*  The inadequacy of the deal price is most visible in the 6.7 times trailing ebitda multiple that is inferred from the press release issued by CCL on March 2, 2016 (Checkpoint's press release fails to highlight the low valuation).  The actual trailing ebitda multiple is likely much lower, after adjusting for $15 million in cost savings that management has identified for 2016, the $7-10 million decline in extraordinary consultant and R&D expense hitting 2015 numbers, and the growth in the core business that is widely expected.  While the trailing ebitda multiple has been depressed under the current management team, it still has averaged 8.2 times over the last 3 years. *If the Company were sold at a 20% deal premium to just this 8.2 average, shareholders would have realized a price closer to $15 per share, not the $10.15 per share that the Board approved.*

\* \* \*

*North Star will not sit quietly and allow this transfer of value from public stockholders to CCL go unchallenged* … Your duty as Chairman of the Board

is to protect shareholders from precisely this kind of harm. We are calling on you
to fulfill your responsibilities.

Emphasis added.

76.     On March 28, 2016, North Star furthered its opposition to the Proposed Transaction
by submitting a second letter to defendant David demanding that Checkpoint postpone its
shareholder meeting in connection with the Proposed Transaction until the Company's
shareholders have had an opportunity to elect a new Board.  North Star also announced that it
intends to solicit votes for the election of its three nominees to the Board at the 2016 annual
shareholders meeting.  In the letter, North Star Managing Partner Andy Jones stated, in pertinent
part:

> We have had the opportunity to review the preliminary proxy statement filed on
> March 17, 2016, and it confirms our suspicions that *this was a poorly timed and
> fundamentally flawed sale process that resulted in an inadequate valuation of the
> Company.*
>
> * * *
>
> Selling from such a position of weakness all but guarantees that there would be a
> reduced level of interest from potential buyers and a poor pricing outcome.  Indeed,
> the decision to even consider selling the Company when earnings were artificially
> depressed reveals the *woeful lack of financial sophistication on the Board* and the
> dire need to reconstitute it with members who will look out for the best interests of
> the shareholders.
>
> The Board's decision to sell the Company at this time is illogical.  Under George
> Babich's leadership as CEO, the Company has had *numerous accounting
> restatements and earnings misses*, which have driven the stock from a peak of
> roughly $18.00 per share in October 2013 to less than $8.00 per share the day before
> the CCL transaction was announced.  However, *Babich's abysmal managerial
> performance, while enormously frustrating for all shareholders, is not a reason
> to sell the Company.*
>
> * * *
>
> Why would we sell our Company today for $10.15 per share when there is an
> opportunity to take this much cost out of our business?  Why would we give up this
> earnings lever to the shareholders of CCL? *This benefits CCL shareholders at the
> expense of Checkpoint shareholders*, which is evident in the performance of

CCL's stock price since the deal was announced.  Since the deal was announced, CCL's stock price is up 12%, compared to the Toronto Stock Exchange Index, which is up 3%.  ***This 9% outperformance is clearly due to the advantageous purchase price that CCL achieved in its negotiation with our Board.***  This 9% equates to $486 million dollars of incremental value for CCL stockholders.  If Checkpoint shareholders were to receive just half of that incremental value, we would be getting an additional $5.85 per share, bringing the deal price to $16.00 per share, which is much closer to what a fair and reasonable value for Checkpoint would be.

Finally, the fairness opinion rendered by Checkpoint's financial advisor is based on valuing the Company on a 4.5-5.5 times EBITDA multiple.  ***This multiple is absurd on both an absolute and relative basis*** given the fact that Checkpoint has traded at an average multiple of 8.2 times EBITDA over the last 3 years.  There are simply ***no companies with the earnings and free cash flow profile that CKP has that trade for sustained periods of time at such low multiples,*** let alone change hands in an arms length-negotiated transaction with a strategic buyer.

***We strongly believe the CCL transaction is poorly conceived and unfairly priced.***  We call on the Board to delay any vote on the proposed deal and instead accelerate the annual meeting so that shareholders will have the opportunity to vote on our proposed slate of directors.  Only after allowing the shareholders a voice on Board composition would it be appropriate to evaluate the proposed transaction.  The stock market and business values have improved greatly over the last month.  We should pause the sale process to reevaluate what is the best way forward for CKP's shareholders.  ***The proposed transaction robs the shareholders of the rightful value of their shares, and to continue on this path is a gross violation of the Board's fiduciary duty.***

Emphasis added.

77.     On March 30, 2016, Wynnefield Capital, Inc. ("Wynnefield"), one of Checkpoint's largest shareholders owning approximately 2.1% of the Company's outstanding shares, issued a press release announcing Wynnefield's "strong opposition to the 'take under' sale" of Checkpoint.  In the press release, Wynnefield President, Chief Investment Officer and Founder Nelson Obus stated, in pertinent part:

The deal price to which Checkpoint's Board has agreed is ***utterly inadequate and an affront to the Company's shareholders***.  Checkpoint is a ***company with a promising future – strong business fundamentals***, including a blue-chip customer base, attractive recurring revenue, ***robust free cash flow and significant RFID opportunity growth***.  Checkpoint's Board has chosen to forego the Company's

intrinsic value and accepted a take-under buyout based on a discounted EBITDA multiple and at a *price that is 25% below where the stock traded just one year ago*. Wynnefield Capital joins like-minded shareholders in urging Checkpoint shareholders to *reject this value-destroying transaction*.

Emphasis added.

78.     The Wynnefield press release further stated, in pertinent part:

Wynnefield Capital reminds Checkpoint shareholders and members of the investment community that *just 10 months ago*, Institutional Shareholder Services (ISS), one of the leading proxy advisory firms, analyzed the Company's governance practices and *awarded Checkpoint a risk rating of '10,' the lowest possible rating that can be awarded to any company*.

Emphasis added.

79.     Rather than continuing as a standalone company and allowing Checkpoint's public shareholders to reap the benefits of the Company's increasingly optimistic prospects and future financial success, the Board acted for its own benefit and the benefit of CCL, and to the detriment of the Company's public shareholders, by entering into the Merger Agreement. The Individual Defendants effectively capped Checkpoint's price at a time when the Company was poised to capitalize on its positioning for long-term growth.

**The Board Impermissibly Locked Up the Proposed Transaction**

80.     In addition to the inadequate and unfair Merger Consideration offered to Checkpoint shareholders, the Merger Agreement is unfair to Checkpoint and its shareholders since it features several provisions that work to deter – or even preclude – other bidders from stepping forward with a superior alternative offer. At best, these provisions clip Checkpoint's wings in any attempt to maximize the consideration to be paid by an acquirer and, at worst, undermine the independence, disinterestedness, impartiality and loyalty of the Board in the negotiation process.

81.     The Merger Agreement impairs the ability of the Board to secure an offer that will adequately capture the true value, financial condition and prospects of the Company and

adequately compensates Checkpoint and its shareholders for their ownership interest in the Company. Specifically, section 5.2 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by CCL. Section 5.2 also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers and prohibits the Company from participating in any discussions or negotiations with any third party regarding an Acquisition Proposal. Further, section 5.2 requires the company to provide CCL with the identity of any competing bidder and all material terms and conditions of such a proposal. This section also contains a "matching rights" provision that allows CCL four (4) business days to match any superior offer, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer.

82.     In addition, section 7.3 of the Merger Agreement requires Checkpoint to pay a termination fee of $13 million to CCL if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide shareholders with a superior offer.

83.     As a result of defendants' unlawful actions, Plaintiff and the other members of the Class will be damaged in that they will not receive their fair portion of the value of the Company's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

84.     Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, to the irreparable harm of Plaintiff and the Class.

85.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

**Insiders' Interests in the Proposed Transaction**

86.     CCL and Checkpoint insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders.  The Company's directors and officers are conflicted because they will receive unique benefits from the Proposed Transaction not available to Plaintiff and the public shareholders of Checkpoint.

87.     While Checkpoint's public shareholders are being cashed out for an inadequate price and foreclosed from participating in the future growth of Checkpoint, in connection with the Proposed Transaction, the Company's directors and officers will achieve a substantial payday. Under section 2.4 of the Merger Agreement, upon consummation of the merger, Checkpoint's directors and officers will receive cash payments from the immediate vesting of all outstanding stock options, restricted stock units and performance-based awards, whether or not vested, in amounts equal to the Merger Consideration - an opportunity that would not otherwise be available.  Although the Proxy fails to disclose the details of these cash payments, the following table summarizes the Board and senior management's equity awards:

| Name | Vested Stock Options (1) | Unvested Stock Options (2) | Outstanding Restricted Stock Units | Performance Shares | Deferred Shares (3) |
|---|---|---|---|---|---|
| **Executive Officers** | | | | | |
| George Babich Jr. | 120,000 | — | 79,230 | 36,920 | 129,830 |
| James Lucania | — | 100,000 | 43,372 | 36,000 | 1,843 |
| Per Levin | 5,565 | — | 30,522 | 32,310 | 83,134 |
| James Wrigley | — | — | 38,246 | 30,150 | — |
| **Directors** | | | | | |
| William S. Antle, III | — | — | 8,750 | — | 170,581 |
| Stephen N. David | 10,000 | — | 8,750 | — | 33,812 |
| Harold Einsmann | — | — | 8,750 | — | 107,393 |
| Daniel R. Maurer | 10,000 | — | — | — | — |
| Julie S. England | — | — | 8,750 | — | 26,570 |
| Marc T. Giles | — | — | 7,000 | — | 18,278 |
| Jack W. Partridge | — | — | 8,750 | — | 82,253 |

88.     In addition to the accelerated vesting of their equity awards, certain members of the Board and management are set to receive substantial cash payments in the form of severance

benefits on termination of employment in connection with a change in control. For example, pursuant to section 10.2 of Babich's Checkpoint employment agreement dated February 4, 2013, if terminated within twelve months of a change-in-control Babich stands to receive a lump sum payment equal to 2.5x his prior year base salary. Indeed, defendant Babich may receive over $4.1 million in golden parachute compensation. All told, certain Checkpoint executive officers stand to receive a total of over $9.76 million in golden parachute payments, as detailed in the chart below:

| Name (1) | Cash Severance (2) | | Equity (3) | Perquisites/ Benefits (4) | Total |
|---|---|---|---|---|---|
| | Base Salary Severance | Bonus Payment Severance | | | |
| George Babich, Jr. | $2,125,000 | $170,000 | $1,787,922 | $   30,435 | $4,113,357 |
| James Lucania | $   731,250 | $   37,592 | $1,184,686 | $   17,167 | $1,970,695 |
| S. James Wrigley | $1,302,000 | — | $   694,219 | $   — | $1,996,219 |
| Per H. Levin | $1,044,000 | — | $   637,745 | $   — | $1,681,745 |

89. Moreover, if the inadequate Proposed Transaction closes, Checkpoint's directors and officers will receive over *$18.8 million* for their illiquid Checkpoint holdings. The Company's directors and executive officers' Checkpoint stock holdings are summarized in the following chart:

| Named Executive Officer, Director, Beneficial Holder or Identity of Group (1) | Amount and Nature of Beneficial Ownership of Common Stock | Percent of Shares Beneficially Owned (2) |
|---|---|---|
| BlackRock, Inc. 55 East 52 nd Street New York, NY 10022 | 4,085,406(3) | 9.82% |
| Earnest Partners LLC 1180 Peachtree Street, NE, Suite 2300 Atlanta, GA 30309 | 2,421,300(4) | 5.82% |
| The Vanguard Group 100 Vanguard Boulevard Malvern, PA 19355 | 2,546,227(5) | 6.12% |
| Dimensional Fund Advisors, LP Palisades West, Building One 6300 Bee Cave Road Austin, TX 78746 | 2,679,942(6) | 6.44% |
| William S. Antle, III | 207,653(7) | * |
| Stephen N. David | 72,562(8) | * |
| Harald Einsmann | 161,143(9) | * |
| Julie S. England | 55,820(10) | * |
| Marc T. Giles | 43,778(11) | * |
| Daniel R. Maurer | 10,000(12) | * |
| Jack W. Partridge | 103,003(13) | * |
| George Babich, Jr. | 645,161(14) | 1.55% |
| Per H. Levin | 228,410(15) | * |
| Jeffrey O. Richard | 0 | * |
| S. James Wrigley | 145,983(16) | * |
| James M. Lucania | 60,650(17) | * |
| Farrokh K. Abadi | 125,383(18) | |
| All executive officers and directors as a group (13 persons) | 1,859,546 | 4.47% |

90.     Instead of attempting to negotiate an agreement reflecting the best consideration reasonably available for the Checkpoint shareholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Transaction to meet their own needs and objectives.  The Board's efforts to advance its members' and officers' personal interests at the expense of the Company's public shareholders have resulted in the inadequate Proposed Transaction being presented to the shareholders at an untenable and inadequate price.

**The Proxy Contains Numerous Material Misstatements and Omissions**

91.     In an attempt to secure shareholder support for the inadequate Proposed Transaction, on March 17, 2016, Checkpoint filed the materially false and misleading Proxy with the SEC and disseminated it to Checkpoint shareholders.  The Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction.  Specifically, as set forth below,

the Proxy fails to provide Company shareholders with material information or provides them with materially misleading information concerning: (i) the valuation analyses prepared by Morgan Stanley in connection with the rendering of its fairness opinion; (ii) Checkpoint management's projections, utilized by Morgan Stanley its financial analyses; and (iii) the sale process leading to the Proposed Transaction. Accordingly, Checkpoint shareholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

92.     The Proxy contains Morgan Stanley's written fairness opinion, and describes the various valuation analyses Morgan Stanley performed in support of its opinion. However, the description of Morgan Stanley's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Checkpoint's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion rendered in support of the Proposed Transaction.

93.     With respect to Morgan Stanley's *Historical Multiples Analysis* contained on page 44, the Proxy fails to disclose at what historical multiples to next twelve month expected adjusted EBITDA Checkpoint traded, as observed by Morgan Stanley.

94.     With respect to Morgan Stanley's *Discounted Equity Value Analysis* contained on pages 44-45, the Proxy fails to disclose how, if at all, Morgan Stanley's analysis incorporates the value of Checkpoint's unlevered free cash flows between February 29, 2016 and December 31, 2016 or 2017.

95.     With respect to Morgan Stanley's *Premia Paid Analysis* contained on page 45, the Proxy fails to disclose the following metrics for each of the selected transactions analyzed:

> (a)     Target name;
>
> (b)     Acquirer name;

(c)     Transaction date;

(d)     Transaction size;

(e)     Transaction type (i.e. cash, stock, combination); and

(f)     Transaction premium.

96.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis* of Checkpoint contained on page 45, the Proxy fails to disclose:

(a)     The definition of "unlevered free cash flow" utilized by Morgan Stanley in its analysis;

(b)     The individual inputs and assumptions utilized by Morgan Stanley to derive the WACC range of 8.0% - 9.7% used to discount cash flows through December 31, 2017;

(c)     The individual inputs and assumptions utilized by Morgan Stanley to derive the cost of equity range of 9.5% - 11.5% used to discount cash flows and terminal values after December 31, 2017;

(d)     The implied perpetuity growth rate range resulting from this analysis;

(e)     How Morgan Stanley treated stock-based compensation expenses (i.e. as a cash or non-cash expense);

(f)     How, if at all, Morgan Stanley incorporated Checkpoint's net operating losses in this analysis; and

(g)     The net debt utilized by Morgan Stanley in this analysis.

97.     The Proxy is false or misleading due to the omissions identified in ¶¶ 93-96 as, without such undisclosed information, Company shareholders cannot evaluate for themselves whether the financial analyses performed by Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness

opinion could be rendered in connection with the Proposed Transaction.   In other words, shareholders require this information in order to fully evaluate the extent to which Morgan Stanley's opinion and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

98.     Additionally, the Proxy does not disclose material information concerning Checkpoint's financial projections.  The Proxy fails to disclose the financial projections for the (i) Base Case, (ii) Upside Case and (iii) Downside Case provided by Checkpoint management, which were relied upon by Morgan Stanley for purposes of its analysis, for years 2016-2020, for the following items:

(a)     EBIT (or D&A);

(b)     Taxes (or tax rate);

(c)     Capital expenditures;

(d)     Changes in net working capital;

(e)     Stock-based compensation expense; and

(f)     Any other adjustments to unlevered free cash flow.

99.     This information is integral to shareholders' evaluation of the Merger Consideration.   Indeed, these financial projections provide a sneak peek into Checkpoint's expected future performance (*i.e.*, growth/profitability) and, consequently, its value as a standalone entity.   More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, it is no surprise that financial projections are among the most highly sought after disclosures by shareholders in the context of corporate transactions such as this.

100.    Finally, with respect to the sale process that led to the Proposed Transaction, the *Background of the Merger* section contained on pages 33-39 of the Proxy is materially deficient in that it fails to disclose:

(a)    How many parties executed nondisclosure agreements with Checkpoint, and whether any nondisclosure agreements contain standstill provisions that are still in effect and currently preclude these parties from making a topping bid for the Company;

(b)    With respect to the communications between the Company and the "several competitors and strategic partners" contacted in late 2014 to assess potential partnerships in the RFID portion of Checkpoint's business, the details of any price discussions and whether these parties were contacted in connection with the 2015 sale process;

(c)    The risks and challenges Checkpoint faced in executing its "series of internal strategic initiatives" in a situation where it remained an independent entity;

(d)    How many parties the Board authorized Morgan Stanley to contact during its June 2, 2015 meeting, and the criteria specified for determining potential counterparties; and

(e)    Why the Board did not instruct Morgan Stanley to solicit a bid from Bidder A in excess of its December 7, 2015 offer.

101.    Defendants' failure to provide Checkpoint shareholders with the foregoing material information constitutes a violation of sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the shareholder vote on the Proposed Transaction, Plaintiff and the other members of the Class (defined below) will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and

are thus threatened with irreparable harm warranting the injunctive relief sought herein.

102.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Checkpoint's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

103.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

104.    Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Individual Defendants for Breach of Fiduciary Duties

105.    Plaintiff repeats all previous allegations as if set forth in full.

106.    The Individual Defendants have violated the fiduciary duties of due care, loyalty, good faith, candor and independence owed to the public shareholders of Checkpoint and have acted to put their personal interests ahead of the interests of Checkpoint shareholders or acquiesced in those actions by fellow Individual Defendants.  The Individual Defendants have failed to take adequate measures to ensure that the interests of Checkpoint's shareholders are properly protected and have embarked on a process that avoids competitive bidding and provides CCL with an unfair advantage by effectively excluding other alternative proposals.

107.    By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, will unfairly deprive Plaintiff and the other members of the Class of the true value of their Checkpoint investment.  Plaintiff and the

other members of the Class will suffer irreparable harm unless the actions of these defendants are enjoined and a fair process is substituted. These harmful acts include, *inter alia*, agreeing to the $13 million dollar termination fee, as well as agreeing to the restrictive no-solicitation, information rights, and matching rights provisions contained in the Merger Agreement. In addition, the Board failed to provide Checkpoint shareholders with material information necessary for them to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

108.    Because the Individual Defendants dominate and control the business and corporate affairs of Checkpoint, and had access to private corporate information concerning the Company's assets, business and future prospects, there was an imbalance and disparity of knowledge and economic power that existed between them and Checkpoint's public shareholders which makes it inherently unfair for the Individual Defendants to pursue and recommend any transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

109.    The Individual Defendants have breached their duties of loyalty, good faith, due care, candor and independence by not taking adequate measures to ensure that the interests of Checkpoint's public shareholders are properly protected from overreaching by CCL and failing to provide Checkpoint shareholders with material information concerning the Proposed Transaction.

110.    By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

111.    The Individual Defendants engaged in self-dealing, did not act in good faith toward Plaintiff and the other members of the Class, and breached their fiduciary duties to Plaintiff and the other members of the Class.

112.    As a result of the actions of the Individual Defendants, Plaintiff and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive full and fair value for their ownership interest in Checkpoint's stock and businesses.

113.    Plaintiff and members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which these actions threaten to inflict.

## COUNT II

### Against All Defendants for
### Aiding and Abetting the Board's Breaches of Fiduciary Duty

114.    Plaintiff repeats all previous allegations as if set forth in full.

115.    Defendants CCL and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

116.    As a result of this misconduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their Checkpoint shares.

117.    Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT III

### Derivatively on Behalf of Checkpoint for Breach of Fiduciary Duties
### Against the Individual Defendants

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

119.    Plaintiff brings this claim derivatively on behalf of Checkpoint.

120.   The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to the Company and have acted to put their personal interests ahead of the interests of Checkpoint.

121.   As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duty of loyalty owed to Checkpoint because, among other reasons:

(a)   they failed to take steps to maximize the value of Checkpoint; and

(b)   they failed to properly value Checkpoint and its assets and operations;

122.   Because the Individual Defendants are in possession of private corporate information concerning Checkpoint's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Checkpoint which makes it inherently unfair for them to pursue and merger wherein they wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

123.   By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Checkpoint.

124.   The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Checkpoint, and have breached and are breaching the fiduciary duties owed to Checkpoint.

125.   Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to the Company, and may consummate the Proposed Transaction without providing the Company and its shareholders a full and fair sale process.

126.    As a result of the Individual Defendants' actions, the Company has and will be irreparably harmed.

127.    The Company has no adequate remedy at law.

## COUNT IV

### Derivatively on Behalf of Checkpoint for Aiding and Abetting the Board's Breaches of Fiduciary Duties
### Against CCL and Merger Sub

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

129.    Plaintiff brings this claim derivatively on behalf of Checkpoint.

130.    Defendants CCL and Merger Sub are well aware that the Individual Defendants have not sought, and are not seeking, to obtain the best possible transaction for the Company's public shareholders.

131.    As alleged in more detail above, CCL and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties by causing the Board members to accept inadequate consideration for the Company's public shareholders and negotiating unreasonably preclusive deal protection terms.

132.    As a result, Checkpoint has been and will be irreparably harmed.

133.    Checkpoint has no adequate remedy at law.

## COUNT V

### Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act
### And SEC Rule 14a-9 Promulgated Thereunder

134.    Plaintiff repeats all previous allegations as if set forth in full.

135.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to section 14(a) of

the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy
> statement, form of proxy, notice of meeting or other communication, written or
> oral, containing any statement which, at the time and in light of the circumstances
> under which it is made, is false or misleading with respect to any material fact, or
> which omits to state any material fact necessary in order to make the statements
> therein not false or misleading or necessary to correct any statement in any earlier
> communication with respect to the solicitation of a proxy for the same meeting or
> subject matter which has become false or misleading.

136.     During the relevant period, defendants disseminated the false and misleading Proxy

specified above, which failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading in violation of

section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

137.     By virtue of their positions within the Company, the defendants were aware of this

information and of their duty to disclose this information in the Proxy.  The Proxy was prepared,

reviewed, and/or disseminated by the defendants.  The Proxy misrepresented and/or omitted

material facts, including material information about the unfair sale process for the Company, the

unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the

Company's assets.  The defendants were at least negligent in filing the Proxy with these materially

false and misleading statements.  The defendants have also failed to correct the Proxy and the

failure to update and correct false statements is also a violation of section 14(a) of the Exchange

Act and SEC Rule 14a-9 promulgated thereunder.

138.     The omissions and false and misleading statements in the Proxy are material in that

a reasonable shareholder would consider them important in deciding how to vote on the Proposed

Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as

significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

139.     By reason of the foregoing, the defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

140.     Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT VI

**Class Claims Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

141.     Plaintiff repeats all previous allegations as if set forth in full.

142.     The Individual Defendants acted as controlling persons of Checkpoint within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of Checkpoint and participation in or awareness of the Company's operations and intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

143.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

144.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.   The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.   They were, thus, directly involved in the making of this document.

145.   In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

146.   By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

147.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' conduct, Checkpoint's shareholders will be irreparably harmed.

### COUNT VII

**Derivative Claim Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

148.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

149.   Plaintiff brings this claim derivatively on behalf of Checkpoint.

150.   During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading in violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

151.    By virtue of their position within the Company, defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and disseminated by Defendants. It misrepresented or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company and its assets. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

152.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view full and accurate disclosures as significantly altering the "total mix" of information made available to them in connection with the decision whether to approve the Proposed Transaction.

153.    By reason of the foregoing, defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

154.    Because of the false and misleading statements in the Proxy, the Company is threatened with irreparable harm and with the interference of proper governance on its behalf that follows the free and informed exercise of the shareholders' right to make an informed vote regarding a corporate merger. Therefore injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT VIII

**Derivative Claim Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

155.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

156.    Plaintiff brings this claim derivatively on behalf of Checkpoint.

157.    The Individual Defendants acted as controlling persons of Checkpoint within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of Checkpoint and participation in or awareness of the Company's operations and intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

158.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

159.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.

160.    They were, thus, directly involved in the making of this document.  In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions

which had input from the directors.

161.   By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

162.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' conduct, the Company and the Company's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Checkpoint, and against Defendants, as follows:

A.   Declaring that Counts 1, 2, 5 and 6 are properly maintainable as a class action;

B.   Declaring that Counts 3, 4, 7 and 8 are properly maintainable as a derivative action, and that Plaintiff is an adequate representative of the Company;

C.   Declaring and decreeing that the Merger Agreement was entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

D.   Rescinding, to the extent already implemented, the Merger Agreement agreed to in connection with the Proposed Transaction;

E.   Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction and any vote on the Proposed Transaction, unless and until they comply with their obligations under sections 14(a) and 20(a) of

the Exchange Act to provide shareholders with all material information concerning the Proposed Transaction, and adequately undertake all appropriate and available methods to maximize shareholder value and remove any conflict of interest that has clouded the process and the Individual Defendants' judgment;

F.      Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.      In the event that the Proposed Transaction is consummated, rescinding the merger, and awarding Plaintiff and the Class compensatory damages and rescissory damages;

H.      Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys' fees, expenses and experts' fees; and

I.      Granting such other and further relief as this Court may deem to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: April 6, 2016                    **BRODSKY & SMITH, LLC**

                                        Evan J. Smith
                                        Marc L. Ackerman
                                        Two Bala Plaza, Suite 510
                                        Bala Cynwyd, PA 19004
                                        610-667-6200
                                        610-667-9029 (Facsimile)

                                        **WEISSLAW LLP**
                                        Richard A. Acocelli
                                        Michael A. Rogovin
                                        Kelly C. Keenan
                                        1500 Broadway, 16th Floor
                                        New York, NY 10036
                                        (212) 682-3025

                                        *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned certifies as follows:

1.     The undersigned has reviewed the complaint filed against Checkpoint Systems, Inc. ("Checkpoint") and others and would authorize the filing thereof, if necessary.

2.     The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.     The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     The undersigned has been, at all relevant times stated in the Complaint, the holder of shares of Checkpoint, reflected in the attached Addendum.

5.     The undersigned has not sought to serve or served as a class representative under the federal securities laws in the last three years, other than listed below (if any):


6.     The undersigned will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED:     March ꓤꓳ, 2016

_____
Harold Litwin

EXHIBIT "1"

P. 1

* * * COMMUNICATION RESULT REPORT ( MAR. 9. 2016  1:23PM ) * * *

FAX HEADER:

TRANSMITTED/STORED : MAR. 9. 2016  1:21PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|------|------|--------|---------|--------|------|
| 183  | MEMORY TX | | 918568485297 | OK | 7/7 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

**WL**
WeissLaw LLP
New York   Los Angeles

16th Floor
1500 Broadway
New York, NY 10036
TEL (212) 682-3025
FAX (212) 682-3010
www.WeissLawLLP.com

# FAX TRANSMISSION

To:

| NAME(s) | COMPANY | TELEPHONE NO. | FACSIMILE NO. |
|---------|---------|---------------|---------------|
| Bryan Rowland | Checkpoint Systems, Inc. | | (856) 848-5297 |

From:   Richard A. Acocelli

Re:

Date:   March 9, 2016

☐ urgent   ☒ for review   ☐ please reply   ☐ per your request

Page No(s)(including this cover page): 7

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (212) 682-3025

Comments:

*This transmission and the attached documents are intended only for the use of the individual to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is prohibited. If you have received this transmission by error, please notify us immediately by telephone so we may arrange to retrieve this transmission at no cost to you. Thank you.*



16th Floor
1500 Broadway
New York, NY 10036
TEL. (212) 682-3025
FAX (212) 682-3010
www.WeissLawLLP.com

# FAX TRANSMISSION

To:

| NAME(s) | COMPANY | TELEPHONE NO. | FACSIMILE NO. |
|---------|---------|---------------|---------------|
| Bryan Rowland | Checkpoint Systems, Inc. | | (856) 848-5297 |

From:     Richard A. Acocelli

Re:

Date:     March 9, 2016

☐ **urgent**          ☒ **for review**          ☐ **please reply**          ☐ **per your request**

Page No(s)(including this cover page):  7

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US <u>IMMEDIATELY</u> AT (212) 682-3025

Comments:

*This transmission and the attached documents are intended only for the use of the individual to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee of agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is prohibited. If you have received this transmission by error, please notify us immediately by telephone so we may arrange to retrieve this transmission at no cost to you. Thank you.*



16th Floor
1500 Broadway
New York, NY 10036
TEL. (212) 682-3025
FAX (212) 682-3010
www.WeissLawLLP.com

Richard A. Acocelli, Esq.
racocelli@weisslawllp.com

March 9, 2016

**VIA FedEx and Facsimile**

Board of Directors
CHECKPOINT SYSTEMS, INC.
c/o Bryan Rowland
Vice President, General Counsel and Corporate Secretary
101 Wolf Drive, P.O. Box 188
Thorofare, New Jersey 08086
Facsimile: (856) 848-5297

Re: <u>Shareholder Demand of Harold Litwin</u>

To the Board of Directors of Checkpoint Systems, Inc.:

We represent Harold Litwin, a shareholder of Checkpoint Systems, Inc. ("Checkpoint" or the "Company") at all times relevant herein. This letter is written on behalf of Mr. Litwin to you the Board of Directors of Checkpoint (the "Board" or "You") in connection with CCL Industries Inc.'s ("CCL") attempt to acquire the Company. We demand on behalf of Mr. Litwin that Checkpoint and You remedy your violations of Pennsylvania law, including breaches of fiduciary duties that have caused, and threaten to cause further, substantial damage to Checkpoint and its shareholders. We demand on behalf of Mr. Litwin that You take the actions described herein.

As You know, Checkpoint and CCL announced their entry into an Agreement and Plan of Merger ("Merger Agreement") on March 2, 2016, pursuant to which CCL will acquire Checkpoint in a transaction purportedly valued at $556 million, including net cash (the "Proposed Transaction"). Under the terms of the Merger Agreement, Checkpoint shareholders will receive $10.15 per share in cash for each share of Checkpoint common stock they own (the "Merger Consideration"). The Proposed Transaction is expected to close in mid-2016.

As described below, the Proposed Transaction is the result of a flawed process that fails to maximize the value of Checkpoint stock for the benefit of the Company's public shareholders and is fundamentally unfair to Checkpoint, Mr. Litwin and the other public shareholders of the Company. The Board owes fiduciary duties of care, loyalty, candor and good faith to Checkpoint and its shareholders. In entering into the materially deficient Merger Agreement, the Board violated and continues to violate applicable law by directly breaching its fiduciary duties. The Board's conduct has caused and will continue to cause serious damage to Checkpoint and its shareholders.

WeissLaw___

The Company has struggled recently with enormous year-over-year foreign currency headwinds and challenging market dynamics. Despite this, Checkpoint has strong long-term growth prospects, including the broader adaptation of its Radio Frequency Identification ("RFID") technology by retail customers. On August 3, 2015, the Company reported its financial results for the second quarter of 2015, including net revenues of $147.6 million as compared to net revenues of $170.9 million year over year, due in part to foreign currency effects of 8.5%. Gross profit margin was 41.7%, and cash provided by operating activities was $0.1 million—including the effect of a $9 million one-time litigation settlement payment. Commenting on the financial results, Checkpoint President and Chief Executive Officer ("CEO") George Babich ("Babich") stated:

> I am pleased to report second quarter performance in-line with management's expectations. While we continue to face a number of challenges in our business, including enormous year-over-year foreign currency headwinds, the sunset of our significant 2014 EAS hardware rollouts and challenging market dynamics in ALS, we are executing on our operational and strategic plans and our 2015 investments in topline growth initiatives are beginning to gain traction.

> * * *

> Finally, later in 2015 and into 2016, we expect one of our largest European customers will begin to deploy our Merchandise Visibility solutions in approximately 150 stores and distribution centers in France. This represents the next step forward with this retailer who we expect to deploy our end-to-end Merchandise Visibility solutions worldwide, beginning in the DC, then into the back-of-store, then in-store.

> * * *

> While we continue to face a number of challenges in our businesses, we also continue to gain share in EAS as we transition and transform our legacy businesses by expanding our RFID capabilities and gaining share in the fast-growing market.

Then on November 3, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015. Checkpoint reported net revenues of $145.9 million as compared to net revenues of $160.6 million year over year, due in part to foreign currency effects of 8.4%. Gross profit margin was 40.2%, and cash provided by operating activities was $8.1 million. Commenting on the financial results, Checkpoint President and CEO Babich remarked:

> Third quarter results were squarely in line with our expectations and slightly ahead of our plan for the first nine months of the year, on a constant currency

WeissLaw LLP

basis. Since our last quarterly report, we have successfully deployed our new E10 2.0 dual RF/RFID-enabled antennas in more than 700 stores for a customer in North America and are currently executing our previously-announced EAS swap-out project in Asia. However, a number of risks and uncertainties have emerged over the past few weeks that we expect to have a material impact on our fourth quarter results...

\* \* \*

Despite these near-term setbacks, we continue to believe in the future of Checkpoint and believe that our stock is undervalued. To that end, during the third quarter we repurchased approximately 439,000 shares, returning an additional $3.4 million in capital to our shareholders, and we expect to continue opportunistic repurchases of our shares in the public market.

On March 3, 2016, Checkpoint issued a press release announcing its financial results for the fourth quarter ("4Q") and full year 2015. For 4Q 2015, the Company reported net revenues of $165.1 million as compared to net revenues of $183.1 million year over year, due in part to foreign currency effects. Gross profit margin was 41%, and cash provided by operating activities was $29.8 million compared to $23.6 million year over year. During 4Q 2015, Checkpoint repurchased 450,000 shares, returning $3.2 million of capital to shareholders. Net revenues for full year 2015 were $587.1 million, as compared to net revenues of $662 million year over year. Gross profit was $244.4 million, as compared to $285 million year over year.

As the Company's stock is undervalued and Checkpoint is positioned for long-term growth, the Merger Consideration paid to Checkpoint shareholders under the Proposed Transaction is inadequate and significantly undervalues the Company. CCL is seeking to acquire the Company at a time when a sale would be disadvantageous to Checkpoint shareholders.

Reaction to the deal has been negative. On March 3, 2016, North Star Partners, LLC ("North Star"), one of Checkpoint's largest shareholders owning 3.9% of the Company's outstanding shares, delivered a letter to Checkpoint Chairman of the Board Stephen David, announcing North Star's opposition to the Proposed Transaction. In the letter, North Star Managing Partner Andy Jones stated, in pertinent part:

The undervaluation of Checkpoint, compared to its intrinsic value, is now more acute than ever. The inadequacy of the deal price is most visible in the 6.7 times trailing ebitda multiple that is inferred from the press release issued by CCL on March 2, 2016 (Checkpoint's press release fails to highlight the low valuation). The actual trailing ebitda multiple is likely much lower, after adjusting for $15 million in cost savings that management has identified for 2016, the $7-10 million decline in extraordinary consultant and R&D expense hitting 2015 numbers, and the growth in the core business that is widely

WeissLaw...

expected.  While the trailing ebitda multiple has been depressed under the current management team, it still has averaged 8.2 times over the last 3 years. If the Company were sold at a 20% deal premium to just this 8.2 average, shareholders would have realized a price closer to $15 per share, not the $10.15 per share that the Board approved.

\* \* \*

North Star will not sit quietly and allow this transfer of value from public stockholders to CCL go unchallenged … Your duty as Chairman of the Board is to protect shareholders from precisely this kind of harm. We are calling on you to fulfill your responsibilities.

Importantly, the Proposed Transaction fails to adequately compensate Checkpoint's shareholders for the significant benefits that CCL will receive from the merger.  In a March 2, 2016 press release issued by CCL, Geoffrey T. Martin, CCL's President and CEO stated:

We have admired Checkpoint for  many years as they built a unique, leading global position providing technology-driven label solutions to the retail & apparel industry.  We are very pleased to welcome their deeply experienced people to CCL where they will continue to focus on this important industry for emerging 'smart label' technologies.

Rather than continuing as a standalone company and allowing Your public shareholders to reap the benefits of the Company's increasingly optimistic prospects and future financial success, You acted for Your own benefit and the benefit of CCL, and to the detriment of the Company's public shareholders, by entering into the Merger Agreement.  You effectively capped Checkpoint's price at a time when the Company was poised to capitalize on its continuing path of success.

CCL and Checkpoint insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders.  The Board and the Company's executive officers are conflicted and in breach of their fiduciary duties because they will receive unique benefits from the Proposed Transaction not available to Mr. Litwin and the other public shareholders of Checkpoint. While Checkpoint's public shareholders are being cashed out for an inadequate price and foreclosed from participating in the future growth of Checkpoint, in connection with the merger You will achieve a substantial payday through the immediate and full vesting of outstanding stock options, restricted stock units and performance-based awards, whether or not vested, issued under the Company's incentive plans - an opportunity that would not otherwise be available.

In addition to the inadequate and unfair Merger Consideration, the Merger Agreement is unfair to Checkpoint and its shareholders since it features several provisions that work to deter – or even preclude – other bidders from stepping forward with a superior alternative offer.  At best,

WeissLaw LLP

Board of Directors                                                    March 9, 2016
Checkpoint Systems, Inc.                                              Page 5 of 6

these provisions clip Checkpoint's wings in any attempt to maximize the consideration to be paid by an acquirer and, at worst, undermine the independence, disinterestedness, impartiality and loyalty of the Board in the negotiation process.

The Merger Agreement impairs the ability of the Board to secure an offer that will adequately capture the true value, financial condition and prospects of the Company and adequately compensates Checkpoint and its shareholders for their ownership interest in the Company. Specifically, section 5.2 of the Merger Agreement includes a "No Solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by CCL. Section 5.2 also demands that the Company terminate any and all prior or on-going discussions with other potential acquirers and prohibits the Company from participating in any discussions or negotiations with any third party regarding an Acquisition Proposal. Further, section 5.2 requires the Company to provide CCL with the identity of any competing bidder and all material terms and conditions of such a proposal. This section also contains a "matching rights" provision that allows CCL four (4) business days to match any superior offer, plus an additional two (2) business day period following a material amendment to the terms and conditions of a superior offer.

In addition, section 7.3 of the Merger Agreement requires Checkpoint to pay a termination fee of $13 million to CCL if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide shareholders with a superior offer.

In accordance with applicable law, You have a fiduciary duty to act in good faith in controlling, managing, overseeing and directing the business, operations and management of Checkpoint. By reason of Your knowledge, recklessness, gross negligence, and/or negligence as alleged herein, You have failed to act in good faith. As a result, You have violated Your fiduciary duties of care, loyalty, and good faith to Checkpoint's shareholders. In violation of Your fiduciary duties, You have caused Checkpoint to enter into the Proposed Transaction on terms that are detrimental to Checkpoint and its shareholders. Steps must be taken to repair the harm that has been and will be caused to Checkpoint and its shareholders.

We demand on behalf of Mr. Litwin that the Board: (i) undertake all appropriate and available methods to maximize shareholder value and remove any conflicts of interest that have clouded the process; (ii) revise the Proposed Transaction as structured in the Merger Agreement to eliminate the preclusive deal protection devices, including, but not limited to, the restrictions on the Board's ability to seek bona-fide offers set forth in section 5.2 of the Merger Agreement and reduction of the prohibitive termination fee; and (iii) refrain from consummating the Proposed Transaction whereby the Company's public shareholders will be cashed out of their valuable Checkpoint holdings for the inadequate Merger Consideration.

By making this demand, we in no way concede the independence or disinterestedness of Checkpoint's Board. In fact, we submit that, based on the Board's numerous conflicts of interest, entanglements, corporate governance failings, fiduciary breaches, and its direct

WeissLaw ᵤₚ ᶜ ⁿⁿ

Board of Directors                                            March 9, 2016
Checkpoint Systems, Inc.                                       Page 6 of 6

involvement in voting to approve and/or negotiating the Proposed Transaction, the Board must
allow these claims to be pursued on behalf of the Company in a meaningful fashion by our client.
This demand is being made, despite the futility thereof, solely pursuant to the requirements of the
law of the Commonwealth of Pennsylvania, which requires such action.

        If You would like to discuss any of the matters contained in this letter, we would be
pleased to meet with the Board or a committee of the Board.


                                          Very truly yours,


                                          Richard A. Acocelli


cc:    Mr. Harold Litwin

**Kevin Metz**
Direct Dial: +1.202.637.2338
kevin.metz@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

# LATHAM&WATKINS LLP

March 15, 2016

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Abu Dhabi | Milan |
| Barcelona | Moscow |
| Beijing | Munich |
| Boston | New Jersey |
| Brussels | New York |
| Century City | Orange County |
| Chicago | Paris |
| Dubai | Riyadh |
| Düsseldorf | Rome |
| Frankfurt | San Diego |
| Hamburg | San Francisco |
| Hong Kong | Shanghai |
| Houston | Silicon Valley |
| London | Singapore |
| Los Angeles | Tokyo |
| Madrid | Washington, D.C. |

### BY EMAIL AND U.S. MAIL

Richard A. Acocelli
WeissLaw LLP
16th Floor
1500 Broadway
New York, New York 10036

Re:   March 9, 2016 Correspondence Regarding Checkpoint Systems Inc.

Dear Mr. Acocelli:

The Board of Directors ("Board") of Checkpoint Systems Inc. ("Checkpoint") has asked me to acknowledge receipt of your March 9, 2016 letter on behalf of Mr. Harold Litwin.

The Board is in the process of evaluating the issues raised in your letter. Under Pennsylvania law the Board is entitled to a reasonable amount of time to respond to the demand. *Cuker v. Mikalauskas*, 692 A.2d 1042 (Pa. 1997) (adopting ALI Principles of Corporate Governance §§ 7.02 – 7.10 and 7.13). In the meantime, the Board would welcome any evidence, information, or insights from you or your client that might assist the Board in its consideration of the matter. In addition, we kindly request that you furnish documentation of your client's continuous ownership of Checkpoint common stock.

Please feel free to contact me if you have any questions.

Very truly yours,

Kevin H. Metz
Latham & Watkins LLP